UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FINANCIAL FEDERAL CREDIT, INC.,


                                    Plaintiff,

                                                          DECISION AND ORDER

                                                          10-CV-6491L

                  v.

CRANE CONSULTANTS, LLC,
RAMAR CRANE SERVICES, LLC,
RAMAR STEEL SALES, INC.,
RAMAR STEEL ERECTORS, INC.,

                                    Defendants.
_____


        This action involves a series of transactions involving the sale of two construction cranes,

and the financing of those sales.  Plaintiff Financial Federal Credit Inc. ("FFC") has sued Crane

Consultants, LLC ("CraneCon"), and Ramar Crane Services, LLC, Ramar Steel Services, Inc., and

Ramar Steel Erectors, Inc. (collectively "Ramar").[1] Ramar has filed a cross claim against CraneCon.

        FFC has moved for "partial" summary judgment granting it declaratory relief on its claims

against Ramar.  (Dkt. #95.)  FFC has also moved for a default judgment against CraneCon.  (Dkt.

#96.)

        Ramar has moved for summary judgment dismissing plaintiff's claims relating to the two

cranes at issue (Dkt. #97, #101).  FFC has also moved to strike the second of Ramar's motions as

untimely.  (Dkt. #106.)

_____

[1]Plaintiff's claims against another defendant, Bernie Klug, d/b/a Klug Crane Service, have been
dismissed, pursuant to a stipulation of the parties, Dkt. #39.

**BACKGROUND**

The facts leading up to this litigation involve a complex series of transactions, although most of them have been stipulated to by FFC and Ramar.  *See* Stipulation of Material Undisputed Facts ("SOF"), Dkt. #95-6.  Plaintiff FFC is a financial services company that specializes in construction equipment financing.  CraneCon is a Maryland company, which at all relevant times was engaged in the business of buying and selling cranes.  Ramar consists of three related construction companies based in Rochester, New York.

On several occasions between 2005 and 2010, FFC provided financing to CraneCon for the acquisition of equipment.  The parties agree that in consideration for that financing, CraneCon granted FFC a "blanket" security interest in virtually all of its present and future assets.  *See* SOF ¶¶ 11, 12; Plaintiff's Ex. 5 (Dkt. #95-9).  In 2005, FFC filed a financing statement in Maryland, perfecting its interest.  *See* Dkt. #95-9 at 29.

In January 2010, FFC extended credit to CraneCon to enable it to purchase a certain crane ("the Liebherr crane"), in the amount of $660,750.  CraneCon and FFC agreed that FFC would have a security interest and lien on the Liebherr Crane.  FFC filed financing statements in Maryland dated January 19 and February 2, 2010, identifying the Liebherr crane as collateral.  *See* SOF ¶¶ 19, 20.

CraneCon reached an agreement to buy the crane from another company, Crane & Rigging, in February 2010.  CraneCon paid Crane & Rigging a $20,000 deposit on or about February 3, 2010, and eventually paid the balance of the amount due under the contract.

As this transaction was occurring, however, CraneCon also was negotiating with Ramar for the sale of the Liebherr crane from CraneCon to Ramar.  In March 2010, Ramar and CraneCon entered into an agreement for Ramar's purchase of the Liebherr crane.  The terms of the agreement were set forth in a purchase order (Dkt. #95-7 at 42).  The purchase price was set at $775,000, with payment in full due prior to delivery.

The purchase order contained some additional terms, however, which are at the heart of the dispute in this case. First, the purchase order provided (in what is sometimes referred to as the "buy-back" provision) that Ramar, at its option, and upon notice given by April 1, 2011, could return the Liebherr crane to CraneCon for $715,000, if certain conditions were met. Those conditions generally related to whether, and as of what date, "the traded in Tadano crane remain[ed] in [CraneCon]'s inventory ... ." Dkt. #95-7 at 42. The Tadano crane was a crane that was owned by Ramar, which had purchased the Tadano crane in 2004.

The purchase order for the Liebherr crane further stated that: (1) the price of the Tadano crane was $450,000; (2) CraneCon would give Ramar a 45-day promissory note in that amount, secured by the note and the Tadano crane; and (3) the note would be interest-free until May 15, 2010, and bear eight percent interest thereafter. *Id.* On the face of it, then, the purchase order called for Ramar to buy the Liebherr crane from CraneCon for $775,000, which was payable in full prior to delivery, and for CraneCon to buy the Tadano crane from Ramar for $450,000, secured by a promissory note and the Tadano crane itself.

Although the purchase order used the term "traded in" with respect to the Tadano crane, the parties did not in fact carry out a simultaneous swap of the two cranes. In late March 2010, Ramar sent CraneCon the entire purchase price of the Liebherr crane and some associated equipment (which brought the total price up to $796,000). CraneCon then delivered the Liebherr crane to Ramar.

CraneCon also gave Ramar the $450,000 promissory note called for in the purchase order for the Tadano crane, but it never paid off that note. Ramar made no demands for payment of the note, and never delivered the Tadano crane to CraneCon. From the record, it appears that the Tadano crane remains in Ramar's possession to this day. In August 2010, Ramar also filed a UCC-1 financing statement with respect to the Tadano crane. *See* Dkt. #95-9 at 26-30.

To complicate matters further, both CraneCon and Ramar obtained financing with respect to these transactions. Ramar financed its purchase of the Liebherr crane in part with a $350,000 loan from M&T Bank ("M&T"), which is not a party to this action. *See* Aff. of Anthony Randall (Dkt.

- 3 -

#7) ¶¶ 35-37.  Ramar has done business with M&T for some years, and in 2006, Ramar renewed a prior agreement with M&T granting M&T a blanket security interest in Ramar's assets.  *See id.* ¶ 9.  Ramar owned the Tadano crane at the time it renewed that security agreement.

In addition, on June 29, 2010, CraneCon entered into a loan agreement with FFC, in the principal amount of $400,750.  This was apparently intended to provide CraneCon with the funds necessary to purchase the Tadano crane pursuant to the purchase order agreement between CraneCon and Ramar.  FFC subsequently filed a financing statement with the State of Maryland identifying the Tadano crane as collateral.  SOF at 14.

CraneCon defaulted on its loan from FFC, however.  That default consisted of outright nonpayments of amounts due, as well as "bounced" checks.  SOF ¶¶ 101-104.  FFC subsequently accelerated the balance of its loans to CraneCon.

FFC then filed this action, seeking judgment against CraneCon and Ramar, both for money damages, and for replevin with respect to both the Liebherr and Tadano cranes, based on FFC's security interest in CraneCon's assets.

In the amended complaint (Dkt. #51), FFC asserts thirteen claims:  (1) replevin, seeking to obtain possession of its claimed collateral (principally the Liebherr and Tadano cranes); (2) breach of contract, against CraneCon, in the amount of roughly $1,678,000; (3) a claim under Maryland law for damages in the amount of $283,501.04, based on CraneCon's issuance of a bad check to FFC in that amount; (4) unjust enrichment, based on Ramar's retention and use of both the Liebherr and Tadano cranes; (5) conversion and "wrongful detention," based on the argument that Ramar has converted FFC's collateral to its own use; (6) negligent misrepresentation (this claim is asserted against CraneCon only); (7) fraud, alleging that both CraneCon and Ramar made false material representations to FFC; (8) intentional interference with contract, alleging that Ramar interfered with the agreements between FFC and CraneCon; (9) constructive trust, asserting that the collateral should be held in trust for FFC; (10) fraudulent conveyance, alleging that any transfer of the claimed collateral was fraudulent and invalid; (11) conspiracy, based on the allegation that CraneCon and

- 4 -

Ramar have conspired together to commit the wrongful acts alleged in the other counts; (12) a claim for declaratory relief, to the effect that FFC's security interest in the two cranes at issue is superior to that of the defendants; and (13) a claim for attorney's fees, costs and expenses.

FFC now seeks "partial" summary judgment granting it certain declaratory relief. (Dkt. #95.) The gist of the relief sought is a declaration that FFC's security interest in both cranes is superior to Ramar's. FFC also has moved for a default judgment against CraneCon, based on CraneCon's failure to retain counsel and to respond to FFC's discovery requests. (Dkt. #96.)

Ramar has cross-moved for summary judgment dismissing all of FFC's claims. Ramar has moved separately as to the Tadano and Liebherr cranes (Dkt. #97, #101), but combined, these two motions effectively seek dismissal of all of FFC's claims against Ramar.

FFC has also moved to strike Ramar's cross-motion regarding the Liebherr crane. (Dkt. #106.) FFC contends that Ramar's motion is untimely, because it was filed after the Court's deadline for dispositive motions. *See* Dkt. #94. Ramar contends that the motion was necessitated by FFC's own motion for summary judgment as to the Liebherr crane, which was filed on the last day for dispositive motions.

## DISCUSSION

### I. Plaintiff's Motion for Default Judgment against Crane Consultants

At oral argument on the pending motions, the Court granted FFC's motion for a default judgment against CraneCon, and directed plaintiff's counsel to submit proof of FFC's damages.[2] FFC has since submitted proof that its damages, as to CraneCon, total $1,134,938.25.

---

[2] The Court previously granted a motion by CraneCon's then-attorney to withdraw as counsel, based on CraneCon's long-term failure to pay its retained counsel or even to communicate with counsel. *See* Dkt. #58, #79.

That proof includes an affidavit of FFC's vice president, Andrew Remias, and an affirmation of its attorney, Jonathan D. Deily, Esq., setting forth the basis for that claim. *See* Dkt. #110, #111. FFC calculates the payoff amount as of April 7, 2014 to be $908,225.07. Together with attorney's fees and costs, the total judgment amount sought comes to $1,134,938.25. FFC also seeks per diem interest of $236.44 from April 7, 2014 to the date of judgment. *See* Andrew Remias Aff. (Dkt. #11) at 4.

Having reviewed those submissions, I find that they are adequately documented, and the Court will enter judgment for FFC in the amount requested, as set forth in the Conclusion of this Decision and Order.


## II. Plaintiff's Motion to Strike

Before turning to FFC's and Ramar's motions for summary judgment, the Court must address FFC's motion (Dkt. #106) to strike Ramar's cross-motion for summary judgment as to the Liebherr crane (Dkt. #101). The basis for FFC's motion is that Ramar's motion was not filed until June 14, 2013, several weeks after the May 3, 2013 deadline for dispositive motions. *See* Dkt. #94.

As Ramar notes, there is authority that a motion to strike a motion for summary judgment is procedurally improper. *See Martin v. Fort Wayne Police Dep't*, No. 11-CV-403, 2014 WL 1031195, at *2 (N.D.Ind. Mar. 17, 2014) (noting that "Rule 12(f) provides that a district court 'may strike from a *pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter,'" but stating that "a summary judgment motion is not a pleading"); *Morroni v. Gunderson*, 169 F.R.D. 168, 170 (M.D.Fla. Oct. 28, 1996) (emphasis added).

To some extent, this is a matter of semantics. While a motion to strike may be an improper vehicle for FFC to raise its arguments concerning Ramar's motion about the Liebherr crane, the Court has nonetheless considered the substance of those arguments. I treat FFC's motion to strike, then, simply as part of its opposition to Ramar's motion.

To the extent that FFC asks the Court to deny Ramar's motion as untimely, I will deny that request. While the Court did set May 3, 2013 as the deadline for dispositive motions, the arguments

raised in Ramar's cross-motion concerning the Liebherr crane are in large part coextensive with those raised in Ramar's (timely) response to FFC's own motion for summary judgment as to the Liebherr crane. Since the issues raised in both motions are substantially identical, I see no prejudice to FFC in allowing Ramar to proceed with its cross-motion. *See Andretti v. Borla Perf. Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (district court correctly found no prejudice by allowing defendant's late filing of motion for summary judgment, because there was no indication that the outcome of the motion would have been different had defendant filed it before the deadline).

### III. Parties' Motions for Summary Judgment

The parties not only agree on most of the pertinent facts, but on much of the relevant law as well. They principally differ about how the law should be applied to the facts.

The various transactions here are generally governed by the Uniform Commercial Code ("UCC").[3] Section 9-201(a) states that "[e]xcept as otherwise provided in this chapter, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." Section 9-203(b) also states that in general, a security interest is enforceable against the debtor and third parties with respect to the collateral only if certain conditions have been met. Those conditions include the signing of a security agreement, the giving of value by the secured party to the debtor, and the debtor's acquisition of rights in the collateral. *Id.*

As explained below, the parties differ over some aspects of those principles (for example, concerning whether FCC gave "value" to CraneCon with respect to the collateral), but where they principally part ways is over UCC § 9-320. That section provides that in general, "a buyer in [the] ordinary course of business ... takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." FFC contends that with respect to the transactions here, Ramar never acquired the status of a buyer in the ordinary course of business ("BIOC") because the contract at issue, as memorialized by the purchase order between

---

[3]The parties disagree as to whether New York or Maryland law should govern here, but as will be seen below, the Court has found no relevant difference between the two.

CraneCon and Ramar, was so unusual, if not unique, as to take it out of the realm of contracts in the "ordinary course of business."

> Under § 1-201(9) of the UCC,
>
> "Buyer in ordinary course of business" means a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.

N.Y. U.C.C. § 1-201(9); Md. Comm. L. § 1-201(9).  Here, FFC contends that the purchase order between CraneCon and Ramar did not comport with the usual practices in the crane industry, and that Ramar therefore cannot be considered a BIOC.

In support of that contention, FFC has submitted a report by its expert witness, John J. Hanretty, who has been involved in the buying and selling of cranes since 1985.  (Dkt. #95-4.)  He opines that the contract between CraneCon and Ramar was outside the norm in two major respects. First, he contends that the buy-back provision allowing Ramar to return the Liebherr crane to CraneCon is highly unusual.

Hanretty also asserts that the "deferred trade-in" provision concerning the Tadano crane is outside the norm in the crane industry.  Hanretty states that trade-ins are not unusual *per se*, but he opines that they generally involve a literal trade, with one party receiving a credit toward its purchase price.

As both sides agree, the agreement between Ramar and CraneCon was not like that.  It called for two distinct transactions, involving the Liebherr and Tadano cranes.  That is reflected in both the purchase order and the parties' actual behavior.  There was no swap of the two cranes; Ramar paid cash for the Liebherr crane, which was delivered to it shortly after the purchase order was signed. The sale of the Tadano crane from Ramar to CraneCon was contemplated in the agreement, but it never came to fruition.  As evidenced by the parties' behavior, the transfer of the Tadano crane was also not a condition precedent of the sale of the Liebherr crane.

The parties differ over their characterization of this arrangement.  FFC contends that the purchase order set forth a single transaction, which included a "deferred trade-in" of the Tadano crane.  FFC claims that this arrangement was highly unusual.

Ramar, however, asserts that the purchase order set forth two discrete, independent sales: a sale of the Liebherr crane from CraneCon to Ramar, and a sale of the Tadano crane from Ramar to CraneCon.  In Ramar's view, neither sale depended on the other.

The purchase order did refer to a "trade-in" of the Tadano crane, but the prospective transfer of the Tadano crane from Ramar to CraneCon was plainly envisioned as an outright sale by Ramar to CraneCon, and that is what occurred here.  The sale of the Tadano crane, even if characterized as a "trade-in," was not a necessary condition of the sale of the Liebherr crane.  The two sales were not required to be simultaneous or dependent on each other, as evidenced by the fact that the Liebherr crane was transferred to Ramar even though the Tadano crane had not yet been (and never was) transferred to CraneCon.

On the facts before me, then, it makes more sense to analyze these as two independent, albeit related transactions.  Ramar and CraneCon agreed on two separate sales; the terms of the sales were simply set forth in the same document.  The two sales should therefore be assessed independently, with due regard for their relationship to each other under the terms of the purchase order.

As to the Liebherr crane, FFC contends that the "buy-back" provision in the purchase order, which allowed Ramar to return the Liebherr crane to CraneCon, under certain conditions, was so unusual that the entire transaction was not in the ordinary course of business.  FFC asserts that this transaction did not "comport[] with the usual or customary practices in the kind of business in which the seller [wa]s engaged or with the seller's own usual or customary practices."

I begin this analysis by noting that CraneCon was in the business of buying and selling cranes.  In addition, there is no evidence that at the time of the transaction, Ramar knew of any liens against the Liebherr crane, or that Ramar otherwise acted in bad faith.  Those facts alone do not answer the question whether Ramar was a BIOC, but they do provide important background.  Whether this particular transaction was made in the ordinary course of business is a separate issue,

but CraneCon and Ramar themselves were plainly an "ordinary" seller and purchaser, respectively, and were free to structure the deal in any way they saw fit.

What the buy-back provision stated was that Ramar had the right to sell the Liebherr crane back to CraneCon for $715,000, up to April 1, 2011, subject to one condition:  Ramar could not force CraneCon to buy back the Liebherr crane prior to March 1, 2011, if CraneCon had the Tadano crane in its possession.  Thus, if CraneCon did *not* have the Tadano crane in its possession, Ramar could force CraneCon to buy back the Liebherr crane at any time prior to April 1, 2011.  Between March 1 and April 1, 2011, CraneCon would be obligated to accept a return of the Liebherr crane, even if CraneCon had possession of the Tadano crane.

In considering this provision, it should be borne in mind that it never did come into play.  CraneCon never took possession of the Tadano crane, and Ramar never sought to sell the Liebherr crane back to CraneCon.  Thus, the so-called buy-back provision had no practical effect.

The same could be said of the trade-in provision.  As this deal unfolded, what took place was a straight sale of the Liebherr crane to Ramar, as well as an abortive, unconsummated sale of the Tadano crane from Ramar to CraneCon.  There was no buy-back, and ultimately no trade-in, deferred or otherwise.  CraneCon, which was in the business of buying and selling cranes, simply sold the Liebherr crane to Ramar, which was in the construction business.  That is the only actual sale that occurred.  *See* UCC § 2-106(1) (defining a "sale" as "the passing of title from the seller to the buyer for a price").  That the contract contemplated that some other events would or might occur does not alter that fundamental fact.

Aside from that, FFC insists that the trade-in and buy-back provisions of the contract were simply not customary or standard within the crane industry.  With respect to the trade-in provision, Anthony Randall, Ramar's chief executive officer, testified that although Ramar "had never [before] taken a promissory note for a trade-in, [Ramar] didn't look at it as a trade-in.  We paid for the Liebherr in full."  Randall Depo. (Dkt. #101-2) at 53.

CraneCon's owner, Harry Lawrence, testified at his July 27, 2012 deposition that he viewed the agreement as calling for a "transaction for the Liebherr with a trade-in of the Tadano," Lawrence

Depo. (Dkt. #101-2) at 149, and he stated that CraneCon had used this sort of arrangement roughly five to ten percent of the time. *Id.* at 212.

As to the "buy-back" provision, Lawrence testified that he believed CraneCon had used a similar provision before. He stated that this provision was his idea, and that it was intended "to take away angst in purchasing." *Id.* at 144, 145. He added that "once an offer like that is on the table, it tends to be part of every other negotiation [from] there out." *Id.* at 145. Lawrence agreed that "the terms of any particular deal vary transaction by transaction," and that "there's no single standard practice" for such deals. *Id.* at 141.

Lawrence also signed an affidavit on October 25, 2010 (Dkt. #27), in which he stated that the deal between CraneCon and Ramar "was not a customary or ordinary business transaction of Crane Consultants, LLC" because of the trade-in and buy-back provisions. *Id.* ¶ 13. He testified at his deposition that this affidavit was prepared by FFC or its counsel, based on information that he provided. *Id.* at 50, 198.

After considering all the evidence before me, I conclude that the deal here between CraneCon and Ramar meets the standard under UCC § 1-201(9) as a sale that "comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices." I further find that Ramar purchased the Liebherr crane as a BIOC, and that it therefore took the Liebherr crane free of any security interest held by FFC.

The fact that some aspect of the contract may have been somewhat unusual does not take it outside the scope of § 1-201(9). The purpose of "BIOC protections [is to] facilitate commerce by assuring that good title is acquired, notwithstanding a prior lien. A buyer takes subject to the security interest only if the buyer knows that the sale violates a term in an agreement with the secured party." *In re SemCrude, L.P.*, 504 B.R. 39, 62 (Bank. D.Del. 2013). The UCC is not intended to lay hidden traps for buyers and sellers who agree in good faith to structure a deal in what may be an unusual way.

There is no proof here that this sale did violate FFC's rights, nor any evidence of bad faith in Ramar's purchase of the Liebherr crane. The parties agree that when CraneCon delivered to

Ramar the certificates of title for the Liebherr crane and associated equipment, the title listed no liens against those items.  SOF ¶ 73.  Randall himself states that prior to this lawsuit, he had no knowledge that FFC had claimed a security interest in the Liebherr crane, Dkt. #7 ¶ 39, and plaintiff has submitted no evidence to the contrary.

Buyers and sellers are free to structure deals as they see fit.  That a particular contract includes certain terms that are unusual, or even unique to that transaction, does not render the buyer anything other than a BIOC.  Section 1-201(9) itself gives the parties some leeway, stating that "[a] buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a pre-existing contract for sale."[4]

It also bears repeating that the UCC explicitly provides that a BIOC "takes free of a security interest created by the buyer's seller, *even if the security interest is perfected and the buyer knows of its existence.*"  UCC § 9-320.  In addition, a BIOC is a "person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods ... ."  In other words, knowledge of the *security interest* does not preclude BIOC status.  Only knowledge that the sale itself violates another person's rights (such as where the buyer knows that the seller does not hold legal title to the item being sold) prevents the buyer from being considered a BIOC.  *See Chen v. New Trend Apparel, Inc.*, __ F.Supp.2d __, 2014 WL 1265916, at *36 (S.D.N.Y. Mar. 27, 2014) (adding that "good faith in the context of the U.C.C. refers to 'honesty in fact in the conduct or transaction concerned'") (citing N.Y. U.C.C. § 1-201(19)); *Arthur Glick Truck Sales, Inc. v. Stuphen East Corp.*, 914 F.Supp.2d 529, 546 (S.D.N.Y. 2012) ("A buyer bears the burden of demonstrating good faith, but, in the absence of allegations to the contrary, there is a presumption of good faith in

---

[4]I do not believe that Lawrence's affidavit creates a genuine issue of material fact in this regard. His deposition testimony explained the origin and purpose of the so-called trade-in and buy-back provisions, and viewing the record as a whole, I conclude that the transaction qualifies as having taken place in the ordinary course of business.  I also note that no jury demand has been made in this action, so the Court is the ultimate factfinder in any event.  *See In re Western Limestone, Inc.*, 538 F.3d 858, 868 (8th Cir. 2008) (faced with contradictory affidavits, bankruptcy court properly found transactions at issue to be usual and customary in the industry, and did not err in crediting one affidavit over the other).

commercial transactions").  There is no evidence here that Ramar even knew of FFC's claimed security interest in the Liebherr crane at the time of the sale, or that the sale itself violated FFC's rights, much less that Ramar *knew* that the sale violated FFC's rights.

As to the Tadano crane, FFC's claims fail for a number of reasons.  For one thing, CraneCon never obtained title to, or possession of the Tadano crane.  CraneCon never made any payments on the promissory note that it had given Ramar, and the contemplated sale never occurred; it was, in the end, a nullity.  There was thus no sale of the Tadano crane, and CraneCon never had any interest in that crane to convey to FFC in the first place.  *See* UCC § 2-106(1) (defining a "sale" as "the passing of title from the seller to the buyer for a price").

The parties also dispute whether FFC gave "value" to CraneCon with respect to the Tadano crane.  Under § 9-203(b) of the UCC, a condition of enforceability of a security interest as against the debtor and third parties is the giving of value by the secured party to the debtor.

FFC does not seem to deny that it never did fund the loan that CraneCon had sought to enable its purchase of the Tadano crane, and that FFC did not include any balance owed on that loan when it accelerated CraneCon's debt.  *See* SOF ¶¶ 91-108.  FFC, however, contends that it provided value to CraneCon through its longstanding relationship with CraneCon, which encompassed the financing that CraneCon used to fund its purchase of the Liebherr crane.  Since CraneCon granted FFC a blanket security interest in its assets, FFC argues, FFC acquired a security interest in the Tadano crane when CraneCon and Ramar entered into the purchase order and CraneCon gave Ramar the promissory note for the Tadano crane.

FFC's convoluted argument begs the question, however, by assuming that CraneCon had some rights to the Tadano crane to begin with.  As stated, CraneCon never obtained possession of the crane or title to the Tadano crane, CraneCon never paid off the note that it issued to Ramar, and the sale was never consummated.

The parties also agree that if FFC has some interest in the Tadano crane, Ramar can defeat that interest if it obtained a purchase money security interest ("PMSI") in the Tadano crane.  Section

9-324 of the UCC provides that a perfected PMSI generally has priority over other security interests.

*See Arthur Glick Truck Sales, Inc. v. Stuphen East Corp.*, 914 F.Supp.2d 529, 536 (S.D.N.Y. 2012).

As the New York Court of Appeals has explained,

A security interest in goods is a purchase-money security interest ... to the extent that the goods are purchase-money collateral with respect to that security interest" (UCC 9-103[b][1]). Purchase-money collateral is defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral" (UCC 9-103[a][1]). A purchase-money obligation is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" (UCC 9-103[a][2]). The UCC therefore establishes two ways that a purchase-money obligation may arise: (1) where the obligor–the debtor–incurs an obligation as all or part of the "price" of the collateral, or (2) where "value" is given to enable the debtor to acquire the collateral.

*In re Peaslee*, 13 N.Y.3d 75, 80 (2009) (alterations omitted). *See also* Md. Comm. L. § 9-103 (setting forth substantially identical provisions).

Ramar contends that there never was *any* effective sale of the Tadano crane by it to CraneCon, but it also argues that even if the purchase order were deemed to have effected a sale of the Tadano crane, then Ramar must be deemed to have obtained a PMSI in the Tadano crane. Ramar contends that the purchase order's provision that the purchase was secured by the crane itself was sufficient to give rise to such an interest.

FFC asserts that Ramar's reliance on § 9-324 is misplaced because the Tadano crane was inventory of CraneCon. Under § 9-324(a), "a perfected purchase-money security interest in goods *other than* inventory ... has priority over a conflicting security interest in the same goods ... ." (Emphasis added.) Under § 9-324(b), "a perfected purchase-money security interest in inventory [generally] has priority over a conflicting security interest in the same inventory ...," but only if certain conditions are met, including the perfection of the PMSI, and proper notice to the holder of the conflicting security interest. FFC argues that Ramar never complied with the notification requirements of § 9-324.

As explained above, however, the Tadano crane never became a part of CraneCon's inventory. The UCC defines "inventory" as

goods, other than farm products, which:

- 14 -

(A) Are leased by a person as lessor;
(B) Are held by a person for sale or lease or to be furnished under a contract of service;
(C) Are furnished by a person under a contract of service; or
(D) Consist of raw materials, work in process, or materials used or consumed in a business.

Md. Comm. L. § 9-102(48); N.Y. U.C.C. § 9-102(48).

Under that definition, the Tadano crane never was part of CraneCon's inventory. FFC contends that "the Tadano Crane is inventory of CraneCon because it is a good that is held for sale or lease to be furnished under contract by CraneCon since CraneCon is in the business of buying and selling cranes." FFC's Mem. (Dkt. #100-2) at 10.

Once again, FFC has assumed a premise of its own argument. CraneCon could not have held the Tadano crane for sale or lease, because CraneCon never took possession of or title to the crane. The crane never became CraneCon's to sell.

In addition, as to the notification requirement, the Official Comment to § 9-324 explains that "[i]f the debtor never receives possession, the five-year period never begins, and the purchase-money security interest has priority, even if notification is not given." Thus, the notification provision does not apply here.

Furthermore, § 9-324(g) provides that "[i]f more than one security interest qualifies for priority in the same collateral ... [,] a security interest securing an obligation incurred as all or part of the price of the collateral has priority over a security interest securing an obligation incurred for value given to enable the debtor to acquire rights in or the use of collateral ... ." Here, CraneCon's ostensible purchase of the Tadano crane was secured by the crane itself. Any interest in the Tadano crane held by FFC was based on an obligation arising from FFC's giving of value to CraneCon to enable CraneCon to purchase the crane. Thus, Ramar's interests would trump those of FFC under this provision as well.

FFC also contends that certain documents filed by Ramar with New York State, concerning the registration of the Liebherr crane, and taxes with respect to the sale of that crane, implicitly reveal that Ramar considered the Tadano crane to have been conveyed to CraneCon. Similarly, FFC argues that Ramar's filing of UCC-1 financing statements in New York and Maryland with respect

to the Tadano crane shows that Ramar understood that the Tadano crane had become a part of CraneCon's inventory.

These arguments are based on a strained interpretation of the facts, which do not support FFC's position. The registration and tax documents–which on their face concern the Liebherr crane–at most indicate what all the parties agree on: that it had been *anticipated* that CraneCon would pay Ramar $450,000 for the Tadano crane. But the simple fact is, that never happened.

As to the UCC-1 financing statements, FFC acknowledges that they were filed only after Ramar became aware of FFC's assertion of an interest in the Tadano crane. That Ramar took steps to attempt to protect its interests, once it learned that FFC was claiming some interest in the Tadano crane, is hardly remarkable. Those filings do not suggest that Ramar believed that the Tadano crane had been conveyed to CraneCon, much less that FFC had a superior interest in that crane.

## CONCLUSION

Plaintiff's motion for partial summary judgment (Dkt. #95) is denied.

Plaintiff's motion for a default judgment as to Crane Consultants, LLC (Dkt. #96) is granted, and the Clerk of the Court is hereby directed to enter judgment in favor of plaintiff and against Crane Consultants, LLC, in the amount of $1,134,938.25, plus $236.44 interest per day from April 7, 2014 to the date of entry of judgment.

The motions for partial summary judgment filed by defendants Ramar Steel Sales, Inc., Ramar Crane Services, LLC, and Ramar Steel Erectors, Inc. (collectively "Ramar") (Dkt. #97 and #101) are granted, and plaintiff's claims against Ramar are dismissed.

The Court further finds and declares that: (1) Ramar purchased the Liebherr crane at issue here as a buyer in the ordinary course of business, and that Ramar took the Liebherr crane free of any security interest held by plaintiff; and (2) Ramar's interest in the Tadano crane is likewise superior to any interest claimed by plaintiff.

Plaintiff's motion to strike Ramar's cross-motion for summary judgment (Dkt. #106) is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       May 12, 2014.